# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

In re:

| | | |
|---|---|---|
| **ADAM R. LONG,** | ) | |
| | ) | **Case No. 14-2617-JAR** |
| | ) | |
| **Debtor.** | ) | |
| _____ | ) | |
| | ) | |
| **ADAM R. LONG,** | ) | |
| | ) | |
| **Appellant,** | ) | **Bankruptcy Case No. 09-23473** |
| | ) | **Adversary No. 09-6172** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JAMES J. YODER,** | ) | |
| | ) | |
| **Appellee.** | ) | |
| _____ | ) | |

## MEMORANDUM ORDER AND OPINION

Debtor Adam Long ("Long" or "Appellant") appeals the Order and Judgment of the bankruptcy court entering a money judgment in favor of creditor James Yoder ("Yoder"), and determining that the debt was non-dischargeable under 11 U.S.C. § 523(a)(2)(A). Having reviewed the record and the applicable law, the bankruptcy court's order and judgment are affirmed.[1]

## I.   Appellate Jurisdiction

The Appellant has elected to have the appeal heard by this Court.[2] The appeal was timely filed by the Appellant, and the bankruptcy court's order is "final" within the meaning of 28

---

[1]After examining the briefs and record on appeal, the Court has determined that oral argument would not significantly assist in the determination of this appeal. *See* Fed. R. Bankr. P. 8019. The case is therefore determined without oral argument.

[2] *See* 28 U.S.C. § 158(c)(1).

U.S.C. § 158(a)(1).[3]

## II.      Standard of Review

In reviewing a bankruptcy court's decision, this Court functions as an appellate court and is authorized to affirm, reverse, modify, or remand the bankruptcy court's ruling.[4]  "The Tenth Circuit follows the established principle that a district court "review[s] the bankruptcy court's legal determinations *de novo* and its factual findings under the clearly erroneous standard."[5] When a case involves mixed questions of fact and law, courts "conduct a *de novo* review if the question primarily involves the consideration of legal principles and apply the clearly erroneous standard if the question is primarily a factual inquiry."[6]  An appellate court reviews a non-dischargeability ruling under § 523(a) *de novo*.[7]  But an appellant's claim that the evidence is insufficient to support the bankruptcy court's legal conclusion is an issue of fact that this Court reviews for clear error.[8]  An appellate court must consider evidence presented to the trial court in a light most favorable to the prevailing party, especially where the fact finder was, as here, the court rather than the jury.[9]  "A finding of fact is clearly erroneous if it is without factual support

---

[3] *See* Fed. R. Bankr. P. 8001–8002.

[4] 28 U.S.C. § 158(a).

[5] *Conoco Inc. v. Styler (In re Peterson Distrib. Inc.)*, 82 F.3d 956, 959 (10th Cir. 1996); *see also, e.g., Carter-Waters Okla., Inc. v. Bank One Trust Co., N.A. (In re Eufaula Indus. Auth.)*, 266 B.R. 483, 487–88, 490–91 (10th Cir. BAP 2001); *In re QuVIS, Inc.*, 469 B.R. 353, 365 (D. Kan. 2012).

[6] *In re Eufaula*, 266 B.R. at 488 (quoting *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564, 572 (10th Cir. 1991)).

[7] *In re Wagner*, 527 B.R. 416, 429 (10th Cir. BAP 2015) (citations omitted).

[8] *Id.* (citations omitted).

[9] *Id.* (citing *Cowles v. Dow Keith Oil & Gas, Inc.*, 752 F.2d 508, 510–11 (10th Cir. 1985)) (such findings are "presumptively correct").

in the record or if, after reviewing all of the evidence, the court is left with the definite and firm conviction that a mistake has been made."[10]  The trial court's decision need only be "permissible," not "correct."[11]  If the bankruptcy court's account of the evidence is plausible in light of the record viewed in its entirety, the district court may not reverse it even though it may have weighed the evidence differently.[12]  "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous."[13]  Finally, determinations made on the basis of the credibility of a witness are given great deference by appellate courts.[14]

## III.   Statement of Facts

On October 16, 2009, Long filed a Chapter 7 bankruptcy petition for relief.  Yoder initiated an adversary proceeding by filing a Complaint alleging that the debt of Long in the sum of $941,780.82 was non-dischargeable under 11 U.S.C. § 523(a)(2)(A) due to Long's fraud and misrepresentation.  The bankruptcy court held a two-day evidentiary hearing, and on December 1, 2014, entered a Nunc Pro Tunc Memorandum Opinion and Order, ruling in favor of Yoder on his Complaint, ruling in favor of Long on a Motion for Sanctions, and overruling Long's Motion

---

[10]*In re Yellow Cab Co-op. Ass'n*, 132 F.3d 591, 597 (10th Cir. 1997) (quoting *In re Peterson Distrib., Inc.*, 82 F.3d 956, 959 (10th Cir. 1996)).

[11]*In re Wagner*, 527 B.R. at 429 (citing *Bill's Coal Co. v. Bd. of Pub. Utils. of Springfield*, 887 F.2d 242, 244 (10th Cir. 1989)) (quotation omitted).

[12]*In re Blinder, Robinson & Co.*, 124 F.3d 1238, 1241 (10th Cir. 1997).

[13]*Id.* at 1241.

[14]*In re Wagner*, 527 B.R. at 432 (citing *Vaughn v. United States (In re Vaughn)*, 765 F.3d 1174, 1180 (10th Cir. 2014)).  *See also* Fed. R. Civ. P. 52(a)(6), made applicable to adversary proceedings by Fed. R. Bankr. P. 7052 (appellate court must give due regard to trial court's opportunity to judge witness credibility).

for Summary Judgment, resulting in a judgment in favor of Yoder in the net sum of $906,551.[15]

After reviewing the record and the parties' briefs, the Court finds, except as noted below, the bankruptcy court's factual findings are accurate and supported by the record as set forth below.[16]

Debtor Adam Long grew up in the Kansas City area. At the time of trial, Long was thirty-three years old, lived in California, and worked as a broker for Ayre Investments. Long was a classmate of Yoder's son, Jay Yoder, and Yoder helped coach Long on a middle school football team. Jay Yoder lived with Long in Florida briefly in 1997, where Long attended college. Long moved back to Kansas City in 2000, and graduated with a degree in business administration from the University of Kansas in 2003. Long then briefly worked for Waddell and Reed as a financial advisor, then went to work for Wells Fargo Financial.

Long worked for Wells Fargo Financial for nine months in 2003, selling consumer finance products, including home loans. While Long did not close the consumer loans or participate in the securitization process, he understood that the home loans were secured by a mortgage, and understood the difference between secured and unsecured debts. After nine months, Long was promoted to a position in the Wells Fargo Home Mortgage Division, which provided subprime loans to less qualified applicants. Again, Long did not handle the preparation

---

[15]The original debt balance with accrued interest on the date the bankruptcy petition was filed was $912,000, based on the $500,000 loan with simple interest of 30% per annum prorated through the petition date. The judgment amount represents the setoff of the discovery sanction against Plaintiff in the amount of $5449.00. There is no appeal from the bankruptcy court's sanction ruling.

[16]The factual matters set forth herein are taken from the bankruptcy court's Nunc Pro Tunc Memorandum Opinion and Order set forth in Appellant's Appendix Vol. 1 at 227, and from uncontested or unrebutted testimony and documents presented at the February 2013 evidentiary hearing. Matters in which testimony conflicted are noted. Because Long contends the bankruptcy court erred because the judgment against him was based on clearly erroneous factual findings, the Court has carefully reviewed the entire record to determine whether the evidence supports a finding that Yoder met his burden of proof on the elements of 11 U.S.C. § 523(a)(2)(A).

of closing documents or the closing of these loans.  Long worked at Wells Fargo in different capacities for approximately two years.  In 2005, Long began working for First National Mortgage Services, where he brokered loans until late 2006.  Long testified that while at First National, he understood that he was selling secured loans that required a mortgage or deed of trust to secure the loan, but that he was never responsible for recording, drafting, or thoroughly reviewing any documents related to the mortgage transaction.  Long testified that despite this experience in the mortgage industry, it was a promissory note, and not a mortgage, that is filed with the appropriate local authorities to perfect a lien for a real estate loan.

Long began "flipping" Kansas City metropolitan area houses in 2004, that is, purchasing and rehabilitating houses for a quick resale.  This was initially a part-time venture for Long, who flipped or turned thirty to 100 lower-value properties in 2004.  Long then ventured into the sale of higher value properties, where it was common practice for lenders to finance the property purchase price and, in some instances, to loan additional funds that were used to rehabilitate, renovate, or build residential properties.  Although there was not testimony that he prepared any mortgage or deed of trust, in all of these transactions, Long was involved and signed the closing documents, including the notes and mortgages.[17]

Long and Jay Yoder rekindled their relationship in 2006, and began socializing together. Long told Jay that he was doing well flipping houses and Jay mentioned that his father had recently retired and might wish to participate in Long's enterprise.  Various witnesses testified that Long and Yoder met anywhere from five to fifteen times between April and November

---

[17]As noted by the bankruptcy court, Missouri is a deed of trust state and Kansas is a mortgage state.  Since the Kansas City metropolitan area straddles the Kansas -Missouri state line, the bankruptcy court used the terms deed of trust and mortgage interchangeably, as the function of both security documents is essential the same, that is, to secure the amount loaned with the real property.  This Court will do the same.

2006. Long described these discussions as his financial "courtship" with Yoder, consistent with relationship building, with an eventual progression to more specific discussions about Long's business.  During November and December 2006, a nascent business relationship formed.

James Yoder graduated from the University of Kansas in 1975 with a degree in business. He was President and CEO of Air Resources, Inc., a company he started in 1983.  In 1998, he purchased Southern Aeroparts.  In 2004, he invested in property in Mexico.  Yoder also owned a restaurant in Montreal and in 2005 purchased condominiums located on the Country Club Plaza in Kansas City, Missouri, where he lived.  At the time of trial, Yoder was approximately fifty-six years old.  Yoder testified that his prior real estate investments were mostly personal in nature, and his other investments were extensive and primarily focused in the aircraft industry, equities, and financial instruments, not the purchase of real property.  Yoder testified that in this case, he was a lender, not an investor.  Yoder testified that he develops a relationship of trust between himself and the other parties to the investment or transaction, and relies upon the integrity and honesty of the other participant in the financial transaction or investment, and that he has had success with his approach.

In November 2006, Long and Yoder reached an agreement in principle that Yoder would loan $500,000 to Long's house flipping business, and the loan would carry a thirty percent interest rate.  Yoder testified that he would not have the funds from the sale of his business until December 2006, so the initial agreement was that the entire loan would be made in January 2007.[18]  In December 2006, the parties met again and discussed the details of the loan.  At this

_____

[18]During the middle of December 2006, the aircraft industry company in which Yoder held an equity interest was sold to a Fortune 500 company.  From the sale, Yoder received net proceeds of approximately $10 million.

meeting, Long asked Yoder, "You want security for this [the loan]?"  Yoder replied that he did.

Either at this meeting or a separate meeting sometime in December, Long requested an advance

of $200,000 on the loan, and on December 2, 2006, Yoder agreed.  At this time, no promissory

note or mortgage was signed by the parties, and the testimony is unclear whether the parties

agreed to collateralize the loan when the $200,000 advancement was made.

On January 18, 2007, Yoder loaned Long an additional $285,000.  At this time, the

parties signed a promissory note for $500,000 (the "Note"); the loan included the $200,000

initial advance, $15,000 interest for the advance, and the additional $285,000, with the $215,000

rolled over into the $500,000 Note.  The Note states, "THIS PROMISSORY NOTE shall be

secured by a Mortgage, filed of record, on the property located at 1000 W. 66th Terrace, Kansas

City, Missouri 64113" (the "Property").  The Property was a higher-end house located just off

Ward Parkway.  Prior to executing the Note, Long showed Yoder and told him there was $1

million equity in the Propety and that Yoder's mortgage would be protected by a mortgage in the

Property.[19]  This conversation occurred prior to the distribution of the second portion ($285,000)

of the loan.  Yoder did not ask Long for an appraisal or valuation of the property or whether

there were any encumbrances against the Property, and Long did not volunteer this information

to Yoder.

The Note signed by the parties was drafted by an attorney, Barry McCormick, who was

Yoder's friend and who occasionally provided Yoder legal assistance.[20]  During the discussions

between Yoder and McCormick during December 2006 and January 2007, the two mutually

---

[19] 2/20/13 Trial Tr. at 225.

[20] 2 Appellant's App. 349, McCormick Dep. at 8–13.

understood that the Note would be secured by a deed of trust. McCormick observed that Yoder

was interested in some sort of security for the Note, but understood that Yoder did not ask

McCormick to draft a mortgage/deed of trust for him because Long had done this before and

Yoder and Long were going to work it out in some fashion. McCormick also observed that

Yoder "was sophisticated enough to know that he would want some sort of security for a loan of

this size." The bankruptcy court determined that McCormick was referring to the Note, hence,

the reference to a mortgage in the Note prepared by McCormick and Yoder's reliance on Long to

prepare and file the mortgage.

Unknown to Yoder, at the time the Note was signed, Long had already granted two

deeds of trust to commercial lenders against the Property, totaling $920,180. Yoder testified that

during the months following the signing of the Note, Long repeatedly assured Yoder that a

mortgage in his favor had been recorded on the Property to secure the Note. Yoder testified that

between January and July 2007, he and Long met on at least ten occasions. Each time Yoder

asked for a copy of the mortgage, and each time Long assured him that it was recorded and that

he would send Yoder a copy.

In June 2007, Long refinanced the Property and borrowed an additional $355,350 against

it, bringing the total amount of liens on the Property at that time to $1,345,350. During the

summer of 2007, Long approached Yoder to borrow an additional $500,000. Yoder refused

unless he received proof that the Note was secured. When such proof was not forthcoming,

Yoder refused to lend any additional money to Long.

By July 2007, Long had refinanced the deeds of trust that encumbered the Property and

Yoder discovered that a mortgage to secure the Note in his favor neither existed nor was filed.

Long offered alternative security by granting a mortgage in some of his other properties during late 2007 to early 2008.  Yoder's accountant, Bill O'Connor, researched the alternative properties and found that none had sufficient equity to secure the Note.  Yoder called the Note due and, as the housing market collapsed, Long was unable to pay the Note.  Yoder filed suit against Long in state court shortly thereafter, and that action was stayed pending the outcome of Long's bankruptcy case.

On July 20, 2007, Long sent an email to his assistant with a request regarding the filing of Yoder's non-existent mortgage that stated in part:

> Melinda,
> Back in February, I gave you the note for Jim Yoder's loan.  You were supposed to have it filed with Coffelt title after I had Heartland bank paid off.  Did you ever take that note to them?  Please let me know as soon as possible.  It looks like Coffelt did not record this and Jim is very upset about it.
>  Adam

The email was sent after Long had encumbered the Property in the principal sum of $1,345,350.  The bankruptcy court did not believe the substance of the email, and found that it was constructed to establish the false impression that Long believed that a mortgage had been filed.  The court noted that the email refers to the filing of the Note, continuing what it characterized as the "ruse" that Long believed that a note and not a mortgage should be filed.

Before the Note was executed, Long showed Yoder approximately fifteen real properties and alleged that equity in those properties was also a component of the lending.  Long asserted that equity in the real properties, in particular the equity in the Property, would be sufficient to collateralize and fully secure the Note.  At the time the Note was signed, Long had already granted two deeds of trust in the Property in the amount of $920,180.  In order for Yoder to have

9

been fully secured, the Property needed to be worth more than the asserted value of approximately $1.5 million.  When the Property was eventually sold in July 2008, the purchase price was $673,000, and there was no indication that it was ever worth more than that.

Accountant O'Connor testified that through June 2007, Long told him Yoder was secured.[21]  O'Connor understood that the Note was fully secured by equity in the Property and that there was back up collateral available.  O'Connor did not review the transaction until after the Note was executed, and the bankruptcy court found his testimony is consistent with Yoder's impression that the Note was fully secured.  Yoder's understanding that the loan was to be made as a secured position with equity in the Property, with other property to serve as backup collateral for liquidity, was conveyed to O'Connor by Long on January 22, 2007, four days after the Note was executed.  O'Connor testified that he considered Long an expert or a professional in the mortgage industry, and Long indicated to O'Connor that Yoder had a secured collateral position in the Property.

Email communications between O'Connor and Yoder also reflect Long's attempts during the summer of 2007 to borrow another $500,000 from Yoder as the "business scheme unraveled."  On July 23, 2007, Long emailed O'Connor:

> Just to follow up with our conversation, you are coordinating with Jim [Plaintiff] and his attorney, correct?  I need to know by mid day tomorrow at the latest if he intends to go forward with the next 500k.  If not, I am flying another money guy in and putting him up for a few days to take his place.  Don't want to do it but he leaves me no choice here.  Hopefully he cools down today.

On August 1, 2007, Yoder emailed Long:

---

[21]2 Appellant's App. 366, O'Connor Dep. Tr. at 101:13–19.

> All I am saying is what I have said all along.  I will give you money, but I have to be completely collateralized in a first position.  I cannot take any chances on losing my money.  I am better off in a Raymond James fund paying 15% than with you paying 30% if I am not protected.

The bankruptcy court characterized Long as "astute, intelligent, and articulate," noting that at the time of the Note, he was quite experienced in real estate purchases and finance.  The court found, however, that much of Long's testimony was not believable and that his testimony and portions of the record were "riddled with examples of his lack of credibility," listing the following examples:

> (1) That he did not understand that a mortgage is necessary to secure a loan on real estate.

> (2) That neither Plaintiff nor his son Jay contacted him until July 20, 2007, regarding the recordation of a mortgage to secure the Note.  Plaintiff credibly testified that he had at least five to ten conversations with Defendant beginning in January 2007 through July 2007 regarding whether a mortgage had been recorded and in which Defendant insisted that a mortgage had been recorded.  Some of these conversations were in person, such as a meeting in Montreal, Canada, as well as two instances in which Plaintiff flew to Kansas City to meet with Defendant during the spring of 2007.  Of course, there was not a mortgage to record.  A number of these conversations were overheard by Kimberly White, Plaintiff's girlfriend at the time.  In her deposition, she testified: "Well, I was there for a lot of the business discussions.  There was twice inside the condo of 1602 that I heard them discuss business and Adam [Defendant] bold-faced tell Jim [Plaintiff] that he had the properties recorded.  There was one time on the balcony in 1602 outside, and once in his Porche Cayenne on the way to Avenues Bistro."

> (3) That he did not understand the basic aspects of a real estate transaction, a note and a mortgage.  Defendant's experience in the subprime lending industry and his success in that industry establish sophistication that belies his assertion.

> (4) That Defendant did not understand a mortgage was necessary

11

to secure a real estate loan when he granted no less than five mortgages on the Property via initial lending and additional financing.  When the last mortgage on the Property was filed on June 18, 2007, the total principal due on the Property debt was $1,345,350.

(5) That only in hindsight does he realize that on the many properties on which he borrowed money, he signed mortgages because he did not pay attention to what he was signing.

(6) That Defendant looked at the Note for five minutes and did not realize that the language of the Note required that the debt be "secured," despite language in the second paragraph of the first page that the "NOTE shall be secured by a Mortgage, filed of record, on the property located at 1000 W. 66th Terrace, Kansas City, Missouri 64113."

(7) That Defendant was unaware the Note was to be secured when Plaintiff and Defendant discussed security for the loans more than one month prior to the effectuation of the Note.

(8) That Defendant told Plaintiff that the Note's security interest would be subject to "permanent financing" on the Property, but then proceeded over the next five months to add $355,500 in debt secured by the Property.  A portion of this additional debt secured by the Property was associated with the costs of renovation.[22]

---

[22]1 Appellant's App. 227, Memorandum and Opinion at 11–13. The bankruptcy court cites to the deposition testimony of Long's girlfriend, Jaime McNeil, that Long acknowledged that he needed and was supposed to file a mortgage in favor of Plaintiff to secure the Note, but that Long wanted to wait until after he had refinanced the original deed of trust. *Id.* at 10 n.16.  The court stated that this testimony supports its finding that Long understood that when he borrowed money from Yoder, a mortgage needed to be filed to secure the debt, as well as the conclusion that Long misrepresented to Yoder that the mortgage had been filed and that he had intended to file a mortgage to protect Yoder and to secure the obligation with equity in the Property.  There is no trial exhibit number cited for this evidence, however, nor is it included in the Record on Appeal of the Appellant's appendix, and the Court does not consider it in its analysis.

IV.    **Discussion**

A.    **Applicable Law**

Here, Yoder sought relief under 11 U.S.C. § 523(a)(2)(A), alleging Long made false representations to Yoder with intent to deceive, upon which Yoder justifiably relied and that caused Yoder loss.  Section 523(a)(2)(A) states:

> A discharge under [11 U.S.C. § 727] does not discharge an individual debtor from any debt—
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

The Court starts its analysis with the recognition that exceptions to discharge are "narrowly construed, and because of the fresh start objectives of bankruptcy, doubt [as to the meaning and breadth of a statutory exception] is to be resolved in the debtor's favor."[23]  At trial, Yoder had the burden of proving each element of his § 523(a)(2)(A) claim by a preponderance of the evidence.[24]  The elements of a § 523(a)(2)(A) claim are: 1) the debtor made a false representation; 2) the debtor made the representation with the intent to deceive the creditor; 3) the creditor relied on the debtor's representation; 4) the creditor's reliance was justifiable; and 5) the creditor was damaged as a proximate result.[25]  The issue of whether a requisite element of

---

[23]*In re Johnson*, 477 B.R. 156, 168 (10th Cir. BAP 2012) (quoting *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997)).

[24]*Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).

[25]*In re Snyder*, 421 B.R. 602 at *2 (10th Cir. BAP 2009) (citing *Fowler*, 91 F.3d at 1373) (internal citation omitted).  In *Field v. Mans*, 516 U.S. 59, 70 (1995) the United States Supreme Court adopted this test, but held the reliance standard to be used is the less stringent subjective standard of "justifiable" reliance, rather than the objective standard of "reasonable" reliance.

§ 523(a)(2)(A) is present is a factual determination reviewed for clear error.[26]

The Tenth Circuit has explained that the exception to discharge under § 523(a)(2)(A) does not include oral statements respecting the debtor's financial condition:

> [Section] 523(a)(2)(A) generally bars the discharge of the debts of an individual debtor to the extent that those debts were obtained by false pretenses, a false representation, or actual fraud.  However, to the extent that those debts were obtained by the use of a false oral statement respecting the debtor's or an insider's financial condition, they are dischargeable.  We hold that such false statements are those that purport to present a picture of the debtor's overall financial health.  Statements that present a picture of a debtor's overall financial health include those analogous to balance sheets, income statements, statements of changes in overall financial position, or income and debt statements that present the debtor or insider's net worth, overall financial health, or equation of assets and liabilities.  However, such statements need not carry the formality of a balance sheet, income statement, statement of changes in financial position, or income and debt statement.  What is important is not the formality of the statement, but the information contained within it—information as to the debtor's or insider's overall net worth or overall income flow.[27]

Long challenges the bankruptcy court's findings on each element, arguing that the factual findings on which the court based its judgment were clearly erroneous and insufficient to support its findings.  Given the nature of the dispute between the parties, it is clear that the case hinged on the credibility of the parties.  The bankruptcy court, as the trier of fact, expressed its views quite strongly on Long's testimony, giving specific examples of his lack of credibility, and this Court will not second guess the bankruptcy court's assessment of credibility.[28]  With this standard in mind, the Court addresses Long's challenges to the bankruptcy court's findings.

---

[26]*In re Lemke*, 423 B.R. 917, 920 n.6 (10th Cir. BAP 2010) (collecting cases).

[27]*Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 714 (10th Cir. 2005).

[28]*See In re Vaughn*, 765 F.3d 1174, 1180 (10th Cir. 2014); Fed. R. Civ. P. 52(a)(6).

## B.     False Representations Made

The bankruptcy court found that

> Defendant told Plaintiff that the Note would be secured and that
> the security for the Note would be not only the Property, but also
> other real property Defendant owned would be backup collateral.
> Defendant represented to Plaintiff that the collateral for the Note
> was sufficient to fully secure the Note.

The court found that these statements refer to the ability to secure the Note, not to Long's

general wealth.[29]  The court then concluded that

> At the time Defendant made these representations to Plaintiff,
> Defendant knew the statements were false because he never
> intended to secure the Note with a mortgage in the Property or in
> any other property owned by Defendant; in addition, there was not
> sufficient equity in the Property to fully secure the Note even if the
> mortgage was filed.

Long advances various arguments regarding why he believes the bankruptcy court's

decision was made in error.  First, Long contends that there was sufficient equity in the Property

at the time the Note was executed based on the values.  Long argues that he had a good faith

belief in the value based on the appraisal he had obtained from one of the existing lenders in

September 2006 and based upon the listing price that was set for the Property.  Even if there was

not sufficient equity in the Property, Long contends that he offered equity in additional

properties as well.  Yoder testified that Long told him that there was approximately $1 million in

equity in the Property prior to the Note.  At the time the loan was made, however, Long had

already encumbered the Property for $920,180, which he did not volunteer to Yoder.  In order

for the Note to be fully secured, the Property needed to be worth more than the asserted appraisal

---

[29]Appellant does not challenge this finding on appeal.

and listing value of approximately $1.5 million.  Long's appraiser testified that the Property was worth $1.5 million once renovations were complete; at the time the loan was made, only fifty percent of the renovations were complete.  This valuation did not account for other expenses such as a realtor's fee.  Long knew that this value assumed many events that had not transpired and did not disclose the liens on the Property, yet represented to Yoder that there was sufficient equity to secure the Note.  Although the parties do not discuss the value of the other lower-end backup properties purportedly offered as collateral at the time of the Note, the record reflects that after Yoder discovered that the mortgage had not been filed against the Property just five months after the Note was signed, there was insufficient equity in these properties to collateralize the Note.  Accordingly, the bankruptcy court's finding that Long misrepresented that there was sufficient equity in the collateral, in particular the equity in the Property, to fully secure the Note is not clearly erroneous.

Long also maintains that Yoder did not testify that Long was to prepare a mortgage, nor is there any evidence that the parties discussed the terms of a mortgage.  Instead, Long urges that it was Yoder's responsibility as the lender to prepare and record the mortgage.  The Court is not convinced.  The bankruptcy court held that the Note expressly stated that the loan would be secured by a mortgage; because the Note was silent as to whose responsibility it was to file the deed of trust, parol evidence is admissible to determine what the parties intended when they included the condition that the Note be secured by a mortgage.[30]  Long denied that he and Yoder had any conversations subsequent to executing the Note about whether the mortgage had been recorded.  Yoder testified that the Note stated that he was to receive a mortgage against the

_____

[30]Appellant does not challenge the bankruptcy court's decision to admit parol evidence.

Property and that it was his understanding that the mortgage was going to be immediately recorded.  Yoder's attorney, who drafted the Noted, testified that he understood that Yoder did not ask him to prepare a mortgage because Long was going to take care of it.  Yoder further testified that he had many subsequent discussions with Long about recording the mortgage.  In February 2007, within a week or two of executing the Note, Yoder testified that he flew from Montreal to Kansas to meet with Long and to get a copy of the recorded mortgage.  Long assured Yoder that "his girl" had recorded it and he would get Yoder a copy.  Long then came to Montreal to try to obtain financing for other ventures and Yoder introduced him to people to help him do so.  Yoder testified that he asked Long about the mortgage at that time, and Long again assured him that it had been recorded.  And, the court rejected Long's charade of sending an email to his assistant on the day he was confronted by Yoder about the fact that the mortgage to secure the Note had never been recorded—in fact, the email reinforced the court's conclusion that Long's testimony was contrived.  The bankruptcy court is in the best position to judge the credibility of the parties' testimony on this point, and clearly found Yoder's testimony to be more credible.  Moreover, Long's argument is circular—if Long had not represented that he would record the mortgage/secure the Note, why did he assure Yoder on numerous occasions that he had done just that?

Long further argues that the statement that the bankruptcy court found to be made by Long is not actionable because it relates to a future promise to perform—that Long would record the mortgage in Yoder's favor to fully secure the Note.  As Long notes, a debtor's misrepresentation of future intentions may constitute a false representation if, at the time the

representation is made, the debtor has no intention of performing as promised.[31]  The bankruptcy court did not clearly err by treating the misrepresentation as actionable.  The statement is either one regarding a present fact (the need and present intent to secure the Note) or a statement by Long regarding his intention to secure the Note in the immediate future.  Nevertheless, the bankruptcy court found that at the time Long made this representation, he knew it was false because he never intended to secure the Note with a mortgage in the Property or any other property he owned.  This conclusion is supported by the fact that Long proceeded to borrow more money against the Property less than five months after he signed the Note, which the court characterized as using the Property as a credit card to generate cash, eviscerating any alleged equity in the Property.  Long knew there was no mortgage of record in favor of Yoder, or he could not have obtained additional encumbrances on the Property.  The bankruptcy court's finding on this element is not clearly erroneous.

### C.      Intent to Deceive

The bankruptcy court concluded that the evidence established that Long made false representations with the intent to deceive Yoder and to induce Yoder into loaning money.  Under § 523(a)(2)(A), the debtor's intent to deceive must be subjective and "may be inferred from the totality of the circumstances, or 'from a knowingly made false statement.'"[32] As discussed above, the bankruptcy court determined that the false statements were knowingly made, with no intention of performing.  In addition, the bankruptcy court determined that, given Long's education, experience, and knowledge, his testimony that he did not realize that a mortgage was

---

[31]*In re Frier*, 604 F.3d 583, 588 (8th Cir. 2010).

[32]*Bartley v. Jacobson (In re Jacobson)*, 485 B.R. 255, 261 (Bankr. D. Kan. 2013) (quoting *In re Young*, 91 F.3d 1367, 1375 (10th Cir. 1996)).

necessary in addition to a promissory note to collateralize a real estate loan was not believable. Long studied business in college, worked in mortgage financing, and was involved extensively in buying and selling houses as part of his flipping venture, which necessarily involved the collateralization of debt with mortgages. The court assessed that Long proceeded to "court" Yoder, and made the misrepresentations to Yoder as part of a "scheme to dupe" Yoder, with the intent that Yoder would rely on Long's misrepresentation and cause Yoder to extend the loan to Long on an unsecured basis and with little real prospect for repayment. As the court noted, Long testified that he considered Yoder to be a good friend, even referring to himself as a member of Yoder's family, yet took no measures to assure Yoder was protected on the Note. Instead, the court found that to the detriment of Yoder, Long used the Property as a "credit card to generate cash," eviscerating any alleged equity the Property may have held at the time of the Note, with no effort to secure Yoder's interest by recording a mortgage. Given the circumstances of this case, the Court finds no error with the bankruptcy court's decision that the intent to deceive element was met.

### D.      Justifiable Reliance

Whether a creditor justifiably relied on a debtor's statement is also subjective.[33] Justifiable reliance "does not require the creditor prove he acted consistent with ordinary care and prudence."[34] To discern whether a creditor's reliance is justifiable, courts should "examine 'the qualities and characteristics of the particular plaintiff, and the circumstances of the

---

[33]*See Field v. Mans*, 516 U.S. 59, 76 (1995).

[34]*Id.* at 70.

particular case, rather than [applying] a community standard of conduct to all cases.'"[35]  A

creditor's reliance is justifiable unless he could have ascertained the falsity of the statements if

he had "utilized his opportunity to make a cursory examination or investigation."[36]  However,

this requirement does not go so far as to require a creditor to check the courthouse for unsatisfied

mortgages when a debtor claims that the property is free from encumbrances.[37]  A creditor is

only required to make an investigation beyond the representations given where "under the

circumstances, the facts should be apparent to one of his knowledge and intelligence from a

cursory glance, or he has discovered something which should serve as a warning that he is being

deceived."[38]  Courts have also held that a creditor's reliance can become unjustifiable if he

continues to lend money after learning of facts that should have alerted him to the defendant's

fraud.[39]  This Court reviews the bankruptcy court's determination of justifiable reliance for clear

error.[40]

    In support of its finding of justifiable reliance, the bankruptcy court found that Yoder

routinely made successful business deals based on his ability to ascertain the character of those

with whom he dealt.  Yoder did not loan money to Long until the two had met on several

occasions to establish a relationship.  The court noted that although Yoder had significant

financial resources, he lacked the "technical savvy" to perform the due diligence that most banks

---

[35]*Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 792 (10th Cir. 2009) (quoting *Mans*, 516 U.S. at 71).

[36]*Mans*, 516 U.S. at 71 (citation omitted).

[37]*Id.* at 70.

[38]*Id.*

[39]*In re Riebesell*, 586 F.3d at 792.

[40]*In re Wagner*, 527 B.R. 416, 434 (10th Cir. BAP 2015) (citing *In re Riebesell*, 586 F.3d at 792).

would have done before lending such a large sum of money. Long declined to inform Yoder of the other better-positioned lenders in the Property and there is no evidence that Yoder would have had any reason to suspect Long was not providing crucial information regarding the encumbrances and equity in the Property. After Yoder learned that Long never created or recorded a mortgage to secure the Note, Yoder refused to lend him more money. The court further noted that Long's claim that he could have procured a $500,000 loan from any number of commercial banks is belied by the fact that he borrowed money at thirty percent interest from Yoder. This led the court to conclude that Long was "becoming desperate for funds and could not have duped a commercial lender into lending $500,000 on an unsecured basis."

Long sets forth a litany of reasons he believes prove Yoder's reliance was not justifiable--Yoder has a business degree and was a sophisticated businessman who had made several purchases of real estate and owned multiple businesses; Yoder made the initial $200,000 advance without asking for security; and Yoder had attorneys, an accountant, and a financial advisor available to him. None of these qualifications defeat the justifiability of Yoder's reliance, which was consistent with his level of experience in the area. The record supports the bankruptcy court's finding that Long was more sophisticated in terms of real estate financing than Yoder was at determining whether to extend it. As the court noted, the level of trust between the parties constituted additional support for the conclusion that Yoder justifiably relied on Long.[41]

Long also contends that Yoder should have taken additional measures, in effect placing the blame on Yoder for trusting him and not investigating everything Long told him. Long

---

[41]*See In re Riebesell*, 586 F.3d at 792.

argues that Yoder had his attorney draft the Note requiring security on the Property, but did not

have counsel prepare a mortgage or investigate the Property.  Indeed, Long asserts that the

reason the Note was not secured is because Yoder never prepared a mortgage to present to Long

for signature and recording.  According to Long, "Yoder closed his eyes and refused to

investigate anything about the transaction."  But Long has not demonstrated the existence of any

"red flags" that would show that the bankruptcy court erred by finding justifiable reliance.  It

was not until after the Note was executed, when Long repeatedly assured Yoder that the

mortgage on the Property had been recorded and that he would provide a copy, that Yoder began

to lose his trust in Long, and contacted counsel to investigate.  Long points to nothing from the

relationship the parties formed prior to the Note that raised any question about the truth of what

Long had represented.  Under the circumstances present in this case, the Court is not convinced

that a lender like Yoder should have known that Long lacked the intent to secure the funds for

the loan advanced.  Even assuming Yoder was somehow negligent in his due diligence, however,

that would not be a defense to Long's intentional misrepresentations, as the standard under

section 523(a)(2)(A) is based on the common law rule that a victim's contributory negligence is

not a defense to an intentional tort.[42]  The Court finds no error with the bankruptcy court's

finding that Yoder's reliance was justifiable.

### E.     Loss

Finally, Long contends that Yoder did not sustain a loss due to his reliance on Long's

---

[42]*See Field v. Mans*, 516 U.S. 59, 70–71 (1995) (quoting Restatement (Second) of Torts § 540 cmt. b, illus. 1) providing example of where seller of land who says it is free of encumbrances, a buyer's reliance on this factual representation is justifiable even if he could have "walk[ed] across the street to the office of the register of deeds in the courthouse and easily have learned of an unsatisfied mortgage"); *In re Snyder*, 421 B.R. 602, at *4 (10th Cir. BAP 2009) (citing *Sanford Inst. for Sav. v. Gallo*, 156 F.3d 71, 75 (1st Cir. 1998)) (explaining that a creditor's negligence does not relieve a debtor of responsibility for his intentional tort).

representations.  The bankruptcy court found that Yoder sustained a loss when Long failed to create and file a mortgage against either the Property or any of Long's other properties as he represented.  While noting that it is questionable whether Yoder would have been fully secured if Long had filed a deed of trust against the Property when the Note was executed, the court found that Long made statements that he had plenty of equity in his other properties to protect Yoder, and that these statements were made to induce Yoder to lend as much money as possible.  The court found that Yoder carried his burden of proof to demonstrate this promise was made and justifiably relied upon when Yoder made the decision to renew the first loan for $200,000, plus the accrued interest of $15,000.  The court further noted that even if the court believed Long's testimony that he intended to file a mortgage after final financing on the Property, there was little, if any equity left to secure the Note after Long obtained additional encumbrances after the Note was entered.  Nor was there any equity in Long's other properties offered as collateral shortly after Yoder discovered the misrepresentations.  Long's arguments on this element simply repeat those rejected above—that it was Yoder's obligation to provide the mortgage.  The record supports the bankruptcy court's finding that Long's misrepresentations were the proximate cause of Yoder's loss, and this Court does not second guess the court's determination on this element.

**V.      Conclusion**

In this case, the bankruptcy court, as the trier of fact, resolved credibility issues in favor of Yoder, rather than Long, going so far as to characterize Long's testimony as contrived.  As the Tenth Circuit BAP explained in another § 523(a)(2)(A) case that hinged on the parties' credibility,

> If the witnesses' presentational credibility were not part of the
> equation, this dispute might have been resolved in favor of either

23

> party.  That alone makes the evidence sufficient to uphold the trial
> court's findings, since the fact finder's choice between two
> accounts, especially when made on the basis of the witnesses'
> credibility, cannot be reversed on appeal.[43]

Such is the case here.  Accordingly, for the reasons stated herein, the bankruptcy court's findings

are not clearly erroneous, and the decision denying discharge of Long's debt to Yoder pursuant

to 11 U.S.C. § 523(a)(2)(A) was appropriate.

**IT IS THEREFORE ORDERED BY THE COURT** that the bankruptcy court's Order

finding the debt owed to James Yoder by Debtor Adam Long is nondischargeable under 11

U.S.C. § 523(a)(2)(A) and Judgment in the amount of $906,551 in Yoder's favor are

AFFIRMED.

**IT IS SO ORDERED.**

Dated: September 18, 2015

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[43]*In re Wagner*, 527 B.R. at 434 (citing *Anderson v. Bessemer City*, 470 U.S. 564 574 (1985) ("[w]here there are two permissible views of the evidence the fact finder's choice cannot be clearly erroneous") (citation omitted).